**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

JOY EVELYN DEGROAT,

Plaintiff,

v. Civ. No. 23-90 KK/SCY

MARCOS CORDERO,

Defendant.

**MEMORANDUM OPINION AND ORDER**

On January 29, 2021, Plaintiff Joy Evelyn DeGroat had a single-vehicle accident and called 911. Defendant Marcos Cordero was one of the New Mexico State Police ("NMSP") officers who responded to the call. Ms. DeGroat has conceded that the responding officers had reasonable suspicion and probable cause to detain and arrest her for driving while intoxicated. Nevertheless, she maintains that Officer Cordero violated her Fourth Amendment rights because he used excessive force to detain and arrest her.[1]

On July 7, 2025, Officer Cordero filed a Motion for Summary Judgment (Doc. 58) ("Motion"), seeking summary judgment on Ms. DeGroat's excessive force claim against him. (*Id.*) In the Motion, Officer Cordero argues that he used objectively reasonable force to detain and arrest Ms. DeGroat and that he is entitled to qualified immunity from her claim. (*Id.*) Ms. DeGroat filed a response in opposition to the Motion on August 7, 2025, in which she tries to counter Officer Cordero's factual contentions but makes no legal argument.[2] (Doc. 60.) On August 21, 2025,

---

[1] The Court dismissed Ms. DeGroat's other claims against Officer Cordero, as well as her claims against Officers Corey Newman and Brian Sanchez and the NMSP, in a Memorandum Opinion and Order filed on September 27, 2024. (Doc. 34 at 27.)

[2] In his Motion, Officer Cordero identifies twenty "Undisputed Material Facts." (Doc. 58 at 3-5.) Ms. DeGroat admits all of these facts except those listed in Paragraphs 3, 14, and 20 of the Motion. (Doc. 60 at 1-4.) However, she also responds to all but the first two listed facts with additional factual allegations and evidence. (*Id.*)

Officer Cordero filed a reply in support of his Motion. (Doc. 61.) Having carefully considered the parties' submissions, the record, and the relevant law, the Court FINDS that Officer Cordero is entitled to qualified immunity from Ms. DeGroat's Fourth Amendment excessive force claim and GRANTS summary judgment in his favor.

## I. Material Facts

Except as otherwise noted, the following facts are undisputed. In the dark, early morning hours of January 29, 2021, Ms. DeGroat was driving a front-wheel-drive Ford Fusion on New Mexico State Road 53 when she had a single-vehicle accident. (Doc. 58, Ex. A[3] at 0:20-0:50; Doc. 58-1[4] at 1-2, 9-10; Doc. 60-1 at 2 ¶ 10.) In this accident, Ms. DeGroat swerved off the road to avoid a deer or elk and drove onto the snow-covered shoulder. (Doc. 58, Ex. A at 2:10-2:30; Doc. 58-1 at 1-2; Doc. 60-1 at 1-2 ¶¶ 5, 7, 9.) The force of the accident caused her front passenger-side wheel to come off and the driver-side airbag to deploy. (Doc. 58, Ex. A; Doc. 60-1 at 2 ¶ 10.) Being "unable to drive the car back to the road," she called 911, and Officers Cordero, Corey Newman, and Brian Sanchez responded to the call.[5] (Doc. 58-1 at 1-2, 9-11; Doc. 60-1 at 2 ¶¶ 11-

[3] Both Ms. DeGroat and Officer Cordero submit video footage from Officer Cordero's lapel camera as exhibits to their briefs on the Motion. (Doc. 58, Ex. A; Doc. 60, Ex. 2.) The exhibits differ in that Ms. DeGroat's Exhibit 2, unlike Officer Cordero's Exhibit A, includes footage from before and after the challenged detention and arrest. (*See id.*) However, the exhibits are identical for the approximately 20 minutes they both cover. (*Id.*) In this Memorandum Opinion and Order, the Court cites primarily to the more concise Exhibit A.

[4] Plaintiff does not object to or otherwise challenge Officer Cordero's submission of his and Officers Newman's and Sanchez's police reports about the at-issue encounter. (*See generally* Docs. 58-1, 60.) Also, courts may consider the contents of police reports in ruling on a summary judgment motion to the extent that the reports "incorporate firsthand observations of the officer," because "the standard that guides the [courts'] consideration of evidence at the summary judgment stage of the proceeding is not whether the evidence would be admissible at trial, rather 'it is whether it could be presented at trial in an admissible form.'" *Wood v. Millar*, 2015 WL 12661926, at *4 (D.N.M. February 19, 2015) (Brack, J.) (quoting *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012)). Accordingly, in resolving Officer Cordero's Motion, the Court has considered the firsthand observations that Officers Cordero, Newman, and Sanchez documented in their reports.

[5] The police reports of the officers on scene indicate that (a) officers were dispatched on January 29, 2021, at around 4:36 a.m., (b) Officers Cordero and Newman arrived at around 5:06 a.m., and (c) Officer Sanchez arrived at around 5:15 a.m. (Doc. 58-1 at 1, 9, 11.)

13.) The officers were in uniform and their patrol cars were fully marked. (Doc. 58, Ex. A; Doc. 58-1 at 1, 9, 11.)

When Officers Cordero and Newman exited their patrol car, they first encountered Lester Beaver, who informed the officers that he had seen Ms. DeGroat's car on the side of the road and had stopped by to check on her. (Doc. 58, Ex. A at 0:45-1:15; Doc. 58-1 at 9.) Mr. Beaver told the officers that Ms. DeGroat was intoxicated and had tried to "take off and get off on the road." (*Id.*)

Officers Cordero and Newman then approached Ms. DeGroat and Officer Cordero introduced himself while Officer Newman stood by. (Doc. 58, Ex. A at 1:15-1:50; Doc. 58-1 at 9.) At the time, Ms. DeGroat was 65 years old, stood about five feet two inches tall, weighed about 120 pounds, and was sitting in the driver's seat of her car. (Doc. 58, Ex. A at 1:15-1:50; Doc. 60-1 at 2 ¶ 15; *id.* at 4 ¶ 26.) Her hands were painful and swollen from psoriatic arthritis. (Doc. 60-1 at 2 ¶ 16.) "[I]t was extremely cold outside." (*Id.* at 3 ¶ 20.)

Ms. DeGroat informed Officer Cordero that she could not hear him because she was hard of hearing and had removed her hearing aid after the battery died. (Doc. 58, Ex. A at 1:55-2:05; Doc. 60-1 at 3 ¶ 18.) Officer Cordero then asked Ms. DeGroat what had happened. (Doc. 58, Ex. A at 2:10-2:30.) She responded that she did not know, but a deer had crossed in front of her, she had tried to keep from hitting it, and she had ended up where she was. (*Id.*; *see also* Doc. 60-1 at 1 ¶¶ 5, 7.)

Officer Cordero next asked Ms. DeGroat how much she had had to drink that night, and in response Ms. DeGroat admitted that she had consumed "about maybe four beers all through like 6 o'clock this evening, 5 o'clock this evening."[6] (Doc. 58, Ex. A at 2:30-3:05; *see also* Doc. 60-1 at 2 ¶ 14.) She also disclosed that she had beer in the car, which she said was for relatives. (Doc.

[6] Nevertheless, in her affidavit, Ms. DeGroat denied that she was intoxicated when she ran her vehicle off the road. (Doc. 60-1 at 2 ¶ 14.)

58, Ex. A at 2:30-3:05.) When Ms. DeGroat spoke, Officers Cordero and Newman smelled alcohol on her breath.[7] (Doc. 58-1 at 2, 9.) On the video footage from Officer Cordero's lapel camera, Ms. DeGroat's speech at times sounds somewhat slurred. (*See generally* Doc. 58, Ex. A.) In her affidavit, Ms. DeGroat denied that her speech was "slurry" but acknowledged that her "voice may sound slightly off when [she is] not wearing [her] hearing aids." (Doc. 60-1 at 2 ¶ 14; *id.* at 3 ¶ 19.)

After Ms. DeGroat admitted to having consumed alcohol before the accident, Officer Cordero twice asked her to "turn off the car and step out of the vehicle" for field sobriety tests. (Doc. 58, Ex. A at 3:15-3:50.) Ms. DeGroat responded, "no, I'm not going to step out of the vehicle. I – freeze to death." (*Id.* at 3:25-3:35.) Following Ms. DeGroat's initial refusal, Officer Cordero spent about five minutes trying to convince her to get out of her car. (*Id.* at 3:35-8:30.) Among other things, he (a) told Ms. DeGroat that if she refused to submit to field sobriety tests, he would arrest her, (b) offered to let her sit in the back of his heated patrol car to keep warm, and (c) warned her that he would use force to remove her from her car if she refused to get out. (*Id.*) Officer Cordero directly told Ms. DeGroat to exit the vehicle at least five more times. (*Id.* at 3:45-3:50; 7:30-8:00.) Ms. DeGroat refused each time by way of responses including, "I'm not stepping out," "I have medical issues," "I have not been drinking," "cold affects me in a really, really bad way," "I'm not drunk," "I'm not doing any field sobriety tests," "I'm not getting out in that cold – weather," and "no, I'm just not doing it."[8] (*Id.* at 3:35-8:30.)

[7] In her response to Officer Cordero's Motion, Ms. DeGroat denies that she smelled of alcohol. (Doc. 60 at 1 ¶ 2.) However, in support, she cites to her affidavit, which does not contradict Officer Cordero's evidence on this point. (*Id.*; *see* Doc. 60-1 at 2 ¶ 14.)

[8] In her affidavit, Ms. DeGroat attested that she "politely refused" to get out of her car because she "believed at the time that [she] could not be compelled to do a field sobriety test if [she] did not agree to it." (Doc. 60-1 at 2 ¶ 17.) However, the video footage from Officer Cordero's lapel camera shows that while Ms. DeGroat's initial refusals were polite, they ultimately became profane and combative. (Doc. 58, Ex. A.)

Ms. DeGroat's responses to Officer Cordero's questions and directions were often tangential, for example, in stating that she needed to see a rheumatologist but her insurance would not pay for it, she had had low tire pressure since she had gotten new tires several months earlier, and she could not find her phone. (*Id.* at 5:10-5:25, 6:15-6:35, 7:25-7:30.) Ms. DeGroat also informed Officer Cordero that her heater was "going" and her car was "working," telling him to "look" at and "listen" to it. (*Id.* at 5:35-5:40, 6:05-6:15.) When Ms. DeGroat began to cry, Officer Cordero responded that she seemed "sad about something" and offered to talk with her in his patrol car where she would be warm, but she tearfully responded that she was fine. (*Id.* at 6:35-7:15.) Ms. DeGroat then asked, "have you guys called my husband yet," even though she had not given the officers her driver's license, identified herself or her husband, or provided any contact information. (*Id.* at 7:15-7:20.)

Around four minutes into the conversation, Officer Cordero opened Ms. DeGroat's car door and advised her that if she did not comply with his lawful warning to exit the vehicle, he would have to force her out. (*Id.* at 7:25-8:15.) Ms. DeGroat continued to refuse to get out of the car. (*Id.*) Becoming more adamant, she stated that she was "perfectly comfortable" where she was at, told Officer Cordero to shut her car door, and denied that she was endangering anyone. (*Id.*) At this point, Officer Newman introduced himself and informed Ms. DeGroat that "the Supreme Court of the United States says that you have to get out of the vehicle." (*Id.* at 8:15-8:30.) Ms. DeGroat repeatedly responded "no" in an increasingly heated voice. (*Id.*)

Officer Newman then reached out and took Ms. DeGroat's arm, directing Officer Cordero to "get her arm" as he tried to pull her out of the car. (*Id.* at 8:30-8:40.) Ms. DeGroat swore at the officers and braced herself inside the vehicle by grabbing the steering wheel, jamming her foot in the vehicle frame, and pushing herself into her seat. (*Id.*; Doc. 58-1 at 2, 9, 11.) As the officers

tried to pull her out of the car, Ms. DeGroat stated "you guys are f*****g with the wrong person. You hear me?" (Doc. 58, Ex. A at 8:40-9:05.)

Shortly after Ms. DeGroat made this statement, about six seconds of blank, silent, green screen interrupts the video footage from Officer Cordero's lapel camera. (*Id.* at 9:12-9:18; Doc. 60, Ex. 2 at 37:14-37:20.) In her affidavit, Ms. DeGroat attested that "[a]t one point" she told Officer Cordero that she "would consent to a blood draw at the hospital." (Doc. 60-1 at 3 ¶ 21.) Ms. DeGroat did not indicate when she made this statement, (*id.*), and it is not audible on the video footage of the challenged detention and arrest. (Doc. 58, Ex. A.) However, it is possible that Ms. DeGroat made the statement during this gap in the footage.

After the video footage resumes, Ms. DeGroat can be heard telling the officers, "F**k – you. You know what? Get the f**k away from me." (*Id.* at 9:19-9:30.) By this time, Officer Sanchez had arrived at the scene, and he told Officer Cordero to move to the passenger side of the vehicle. (*Id.* at 9:25-9:45; Doc. 58-1 at 11.) As Officer Cordero did so, one of the other officers said, "I don't want to hurt you, ma'am," while Ms. DeGroat shouted at them. (Doc. 58, Ex. A at 9:25-9:45.) After Officer Cordero reached the other side of the car and opened the passenger door, he stated loudly, "ma'am, if you don't get out, I'm gonna to tase you." (*Id.* at 9:52-9:55.) Nevertheless, Officer Cordero did not tase Ms. DeGroat. (*See generally id.*; *see also* Doc. 60-1.)

In her affidavit, Ms. DeGroat attested that she "initially resisted [the officers'] efforts to physically remove [her] from [her] vehicle" but "[u]pon being threatened with a Tazer gun, [she] complied and was moving to exit the vehicle." (Doc. 60-1 at 3 ¶¶ 22-23.) She further attested that "[a]s [she] was exiting the vehicle," she put her arm "through the steering wheel to grab [her] purse" and her "shoulder became essentially jammed in the steering wheel, anchoring [her] body to the car." (*Id.* at 3-4 ¶¶ 24-25, 28.) However, there is no evidence that she told the officers that

she was trying to get out of the car or that she had become stuck. (*See generally id.*; *see also* Doc. 58, Ex. A.)

Instead, Ms. DeGroat demanded that the officers tell her why she needed to get out of the car. (Doc. 58, Ex. A at 9:55-10:20.) One of the officers responded that he could smell alcohol on her breath. (*Id.*) Ms. DeGroat then stated, "okay, so I had a f*****g beer. Get the f**k away from me. You know what? You are going to pay for this s**t." (*Id.*) Ms. DeGroat then continued to resist, saying "let go of my f*****g shoulder, you're killing me," and "I'm not getting out." (*Id.* at 10:25-10:35.)

Officer Cordero placed his hands on Ms. DeGroat's back, pushing her from the passenger side, while the other officers tried to dislodge her from the driver side. (*Id.* at 10:30-10:40; Doc. 58-1 at 9, 11.) Ms. DeGroat shouted, "[s]on of a b***h, you're killing my f*****g shoulder," and one of the officers responded, "then get out of the vehicle." (Doc. 58, Ex. A at 10:40-10:45.) Instead, Ms. DeGroat demanded that the officers "let go of [her] arm." (*Id.* at 10:45-10:50.) One of the officers then stated, "we'll let go of you as soon as you get out." (*Id.*) But Ms. DeGroat still resisted getting out of the vehicle, stating that she was "not letting go of [her] arm – or leg, buddy." (*Id.* at 10:55-11:05.)

Shortly thereafter, the officers succeeded in dislodging Ms. DeGroat, pushing and pulling her from the vehicle and moving her to the ground.[9] (*Id.* at 11:05-11:15.) The officers then tried to handcuff her while she physically resisted their efforts. (*Id.* at 11:15-12:20; Doc. 58 at 5 ¶ 18; Doc. 58-1 at 2; Doc. 60 at 3 ¶ 6.) Ms. DeGroat shouted, "son of a b***h," (Doc. 58, Ex. A at 11:30-11:34), and then another five seconds of blank, silent, green screen interrupts the video footage from Officer Cordero's lapel camera. (*Id.* at 11:34-11:39; Doc. 60, Ex. 2 at 39:35-39:40.) After

[9] However, even viewed in Ms. DeGroat's favor, the footage does not show that the officers "slammed" her onto the ground and her attestation to that effect thus fails to create a genuine factual dispute. (*See* Doc. 60-1 at 4 ¶ 31.)

this second gap, Ms. DeGroat began screaming in pain. (Doc. 58, Ex. A at 11:39-11:55; *see also* Doc. 60-1 at 4-5 ¶ 32.) She shouted, "that hurts," and that the officers were "breaking [her] f*****g arm," and Officer Cordero responded, "stop resisting then." (Doc. 58, Ex. A at 11:45-12:00.) Ms. DeGroat attested that she believes her shoulder was "completely dislocated" while the officers were handcuffing her. (Doc. 60-1 at 4-5 ¶ 32.)

After the officers handcuffed Ms. DeGroat's hands behind her back, they rolled her onto her side, moved her to a sitting position, and helped her to stand. (Doc. 58, Ex. A at 12:20-12:50.) As the officers helped Ms. DeGroat up and escorted her away from her car, Ms. DeGroat cried and asked the officers several times to "please" let her put her right shoulder down. (*Id.* at 12:35-14:40.) One of the officers responded, "we will in just a second" and "walk with us." (*Id.*) As they walked, Officer Cordero said he felt like Ms. DeGroat's elbow was dislocated. (*Id.* at 14:08-12.) When they reached a patrol car, Officer Cordero removed the handcuffs from Ms. DeGroat and reapplied them so that her hands were cuffed in front of her body. (*Id.* at 14:40-15:50.) Shortly afterward, Ms. DeGroat made sexually provocative remarks to the officers and called them "f*****g a******s" while Officer Cordero conducted a pat-down search and seated her in the back of his patrol car. (*Id.* at 16:05-19:15.)

Emergency medical service providers arrived at the scene and evaluated Ms. DeGroat's shoulder pain. (Doc. 1 at 4 ¶ 16; Doc. 58-1 at 2, 9, 11; Doc. 60, Ex. 2 at 1:14:20-1:14:30, 1:15:25-1:15:35.) Ms. DeGroat declined to be transported to the hospital for treatment. (*Id.*) Nevertheless, she again complained of pain as Officer Cordero drove away from the scene. (Doc. 60, Ex. 2 at 2:03:40-2:04:50.) During the drive to the NMSP office in Milan, New Mexico, Ms. DeGroat asked several times to be taken to the hospital or the emergency room. (*Id.* at 2:28:10-2:29:50.) According to Officers Cordero's and Newman's reports, Ms. DeGroat waited in a holding cell

while Officer Cordero completed paperwork and then the officers took her to Cibola General Hospital, where hospital staff cleared her before she was booked into the Cibola County Detention Center. (Doc. 58-1 at 2, 9.) In her affidavit, however, Ms. DeGroat denied that she was ever "taken to the hospital for treatment of any kind" before she was taken to the detention center.[10] (Doc. 60-1 at 5 ¶¶ 33-35.)

Ms. DeGroat attested that she had to have surgery due to the dislocation of her shoulder during her detention and arrest, that she may need additional surgery in the future, and that the injury has restricted her ability to use her arm and caused her "a great deal of pain." (*Id.* at 7 ¶¶ 47-49.)

## II. Legal Standards

Under Federal Rule of Civil Procedure 56, summary judgment is warranted when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "A dispute is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmoving party, and a fact is material when it might affect the outcome of the suit under the governing substantive law." *Bird v. W. Valley City*, 832 F.3d 1188, 1199 (10th Cir. 2016) (quotation marks and brackets omitted).

Under Rule 56, the Court's role is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions,

[10] Although Ms. DeGroat attested that she was not taken to the hospital for medical treatment before she was booked into the detention center, (Doc. 60-1 at 5 ¶¶ 33-35), her complaint includes no claim related to this alleged conduct, and her attestation is immaterial to her sole remaining claim that Officer Cordero used excessive force in removing her from her car and handcuffing her. (Doc. 1.)

not those of a judge ruling on a motion for summary judgment." *Id.* at 255. Thus, at the summary judgment stage, courts must credit the nonmovant's cognizable evidence and draw all justifiable inferences in her favor. *Id.* However, courts cannot draw "unreasonable inferences that are unsupported by the record." *Estate of Redd ex rel. Redd v. Love*, 848 F.3d 899, 906 (10th Cir. 2017).

Courts analyze summary judgment motions raising qualified immunity somewhat differently from other summary judgment motions. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). "The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quotation marks omitted). When a defendant asserts that he has qualified immunity from a constitutional claim brought under 42 U.S.C. § 1983, "this affirmative defense creates a presumption that the defendant is immune from suit." *Sanchez v. Guzman*, 105 F.4th 1285, 1292 (10th Cir. 2024) (quotation marks and brackets omitted). To overcome this presumption, the plaintiff bears "the burden of showing that (1) the officer['s] alleged conduct violated a constitutional right, and (2) that right was clearly established at the time of the violation." *Id.* (quotation marks and brackets omitted).

In determining whether a right was clearly established, courts must assess the objective legal reasonableness of the challenged action "at the time of the alleged violation" and ask "whether the right was sufficiently clear that a reasonable officer would understand that what he is doing violates that right." *Medina*, 252 F.3d at 1128 (quotation marks and brackets omitted). Courts must analyze this question not "at a high level of generality" but rather "in light of the specific context of the case." *Mullenix*, 577 U.S. at 12. "The specificity of clearly established law is especially important in the Fourth Amendment context, where … it is sometimes difficult for an

officer to determine how the relevant legal doctrine … will apply to the factual situation the officer confronts." *Sanchez*, 105 F.4th at 1293 (quotation marks and brackets omitted).

Accordingly, "[i]n resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry." *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018). Specifically, when a defendant raises the defense of qualified immunity in a summary judgment motion, the burden shifts to the plaintiff to show that "(1) a reasonable jury could find facts supporting a violation of a constitutional right and (2) the right was clearly established at the time of the violation." *Wilkins v. City of Tulsa*, 33 F.4th 1265, 1272 (10th Cir. 2022); *Medina*, 252 F.3d at 1128-29. "A defendant is entitled to qualified immunity if the plaintiff fails to satisfy either prong."[11] *Ibarra v. Lee*, No. 22-5094, 2023 WL 6939236, at *8 (10th Cir. 2023).[12]

In determining whether a plaintiff has met her burden in response to a summary judgment motion asserting qualified immunity, courts construe the facts in the light most favorable to the plaintiff as the nonmoving party. *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). Nevertheless, the plaintiff's version of the facts must go beyond the pleadings and find support in the record. *Id.* Moreover, courts cannot adopt a party's version of the facts if the record blatantly contradicts it, so that no reasonable jury could believe it. *York v. City of Las Cruces,* 523 F.3d 1205, 1210 (10th Cir. 2008) (quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)). Among other things, courts cannot adopt a party's version of the facts when "there is clear contrary video evidence." *Thomas v. Durastanti,* 607 F.3d 655, 659 (10th Cir. 2010).

---

[11] Courts have the discretion to decide in which order to address the two prongs of the qualified immunity analysis. *Soza v. Demsich*, 13 F.4th 1094, 1099 (10th Cir. 2021); *McCoy*, 887 F.3d at 1045. Here, the Court finds it appropriate to address each prong in order.

[12] In the Tenth Circuit, unpublished decisions are not binding precedent but may be cited for their persuasive value. *United States v. Austin*, 426 F.3d 1266, 1274 (10th Cir. 2005).

## III. Analysis

As a preliminary matter, the Court notes that it previously denied Defendants' motion to dismiss Ms. DeGroat's excessive force claim against Officer Cordero because, accepting the allegations in her complaint as true, she was

> a nonviolent misdemeanant who posed no immediate threat to Officer Cordero or others and was not actively resisting arrest or trying to flee, yet Officer Cordero used violent force against her without giving her warning or a chance to submit to arrest, pulling her from her vehicle and slamming her to the ground with such force as to injure her.

(Doc. 34 at 17.) The Court held that using force in those circumstances would violate Ms. DeGroat's clearly established Fourth Amendment rights. (*Id.*) However, at the summary judgment stage, Ms. DeGroat has admitted to facts that contradict and undercut key allegations in her complaint. (*See generally* Doc. 60.) The Court must therefore consider anew, based on the factual record now before it, whether a reasonable jury could find that the degree of force Officer Cordero used against Ms. DeGroat was objectively unreasonable, and whether she has shown that his use of force violated a clearly established constitutional right. The Court will address each of these issues in turn.

### A. A reasonable jury could not find that Officer Cordero used excessive force against Ms. DeGroat.

Under the first prong of the qualified-immunity analysis, the Court must consider whether, viewing the cognizable evidence in her favor, a reasonable jury could find for Ms. DeGroat on her claim that Officer Cordero used excessive force when he detained and arrested her. (*See* Doc. 1 at 4-5.) "When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures." *Wilkins*, 33 F.4th at 1272-73. Courts apply an "objective reasonableness" standard to determine whether a law enforcement officer used excessive force, judging the force used "from the perspective of a reasonable officer

on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 388, 396 (1989).

"Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (quotation marks omitted). "[T]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," and

> requires careful attention to the facts and circumstances of each particular case, including [(1)] the severity of the crime at issue, [(2)] whether the suspect poses an immediate threat to the safety of the officers or others, and [(3)] whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.

*Id.* (quotation marks and citation omitted). Importantly,

> [n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.* at 396-97 (quotation marks and citation omitted).

"Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* at 396. With respect to traffic stops in particular, "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment[.]" *Arizona v. Johnson*, 555 U.S. 323, 331 (2009). And "it necessarily follows that [officers] can use reasonable force to execute those orders. Otherwise, the power to order the driver to exit the vehicle would be hollow." *Helvie v. Jenkins*, 66 F.4th 1227, 1238 (10th Cir. 2023).

Here, Ms. DeGroat has conceded that Officer Cordero had reasonable suspicion and probable cause to detain and arrest her for driving under the influence of intoxicating liquor on the morning in question. (Doc. 1 at 2-3 ¶¶ 6, 9; Doc. 30 at 1 ¶¶ 1-3; Doc. 34 at 3, 7; *see also* Doc. 60-1 at 2 ¶ 14.) Officer Cordero was therefore justified in using some degree of force to effect the detention and arrest. *Graham,* 490 U.S. at 396. Further, Officer Cordero was entitled to order Ms. DeGroat to exit her vehicle and to use reasonable force to enforce that order. *Helvie*, 66 F.4th at 1237-38. Thus, whether a reasonable jury could find that Officer Cordero used excessive force turns on whether the degree of force he used was objectively reasonable from the perspective of a reasonable officer on the scene. *Graham*, 490 U.S. at 396-97. In assessing the reasonableness of Officer Cordero's alleged actions, the Court pays particular attention to the three factors listed in *Graham* while bearing in mind "the totality of the circumstances." *Id.* at 396.

As the Court has previously noted, the Tenth Circuit has held that misdemeanors such as driving while intoxicated are "non-severe" crimes under the first *Graham* factor. *Id.*; (Doc. 34 at 7-8 (citing cases).) Thus, when an officer has stopped a motorist for the New Mexico misdemeanor of driving under the influence of intoxicating liquor, the first *Graham* factor weighs against the use of more than "the minimal force ordinarily needed to accomplish the task of removing [the] motorist from his vehicle." *Helvie*, 66 F.4th at 1241; (Doc. 34 at 7-8.) However, when the motorist escalates the situation by resisting removal, the officer is justified in using additional force to overcome the motorist's resistance. *Helvie*, 66 F.4th at 1241 (after misdemeanor suspect physically resisted removal, officer was justified in dragging suspect out of vehicle by his leg); *see also* *Mecham v. Frazier,* 500 F.3d 1200, 1202–05 (10th Cir. 2007) (officer's use of pepper spray to remove resistant misdemeanor suspect from vehicle was "unfortunate" but "not excessive").

In this case, as just noted, it is undisputed that Officer Cordero detained Ms. DeGroat based on the reasonable suspicion that she had been driving under the influence of intoxicating liquor. Thus, the first *Graham* factor weighs against the use of more than minimal force at the inception of the traffic stop. *Helvie*, 66 F.4th at 1241. However, based on the cognizable evidence in the record, no reasonable jury could find that Officer Cordero used more than minimal force for the first several minutes of the encounter. Indeed, it is undisputed that Officer Cordero initially used no physical force at all in his attempts to get Ms. DeGroat to exit her vehicle. (*See* Section I., *supra*.) Rather, he spent well over four minutes trying to verbally order or persuade her to do so. (*Id.*) Only after Ms. DeGroat repeatedly refused to obey Officer Cordero's lawful orders to exit the vehicle and ignored his warnings that he would use force to extract her if she did not comply, did he and the other officers use any force against her. (*Id.*)

In addition, the undisputed material facts confirm that the force the officers then used was no greater than the force ordinarily needed to accomplish the task of removing a motorist from her vehicle. Specifically, the officers' initial use of force was minimal, consisting of no more than opening Ms. DeGroat's car door and taking her by the arm to pull her from the vehicle. (*Id.*) But instead of yielding to this minimal use of force, she responded with physical resistance. (*Id.*)

Ms. DeGroat's resistance to the officers' initial use of minimal force justified the use of additional force to overcome the resistance. *Helvie*, 66 F.4th at 1241. And, based on the cognizable record evidence, no reasonable jury could find that the additional force the officers used was objectively unreasonable. Specifically, Officer Cordero did not tase Ms. DeGroat as he threatened to do. (*See* Section I., *supra*.) Instead, he and the other officers used a simple push-and-pull technique to dislodge her from her car and move her to the ground, where they worked against her continued resistance until they were able to handcuff her. (*Id.*) As soon as they succeeded in

handcuffing her, they sat her up, helped her to her feet, walked her to a patrol car, and repositioned the handcuffs in front of her body in response to her complaints of pain. (*Id.*)

In concluding that Officer Cordero and his fellow officers reasonably escalated their use of force in response to Ms. DeGroat's resistance, the Court is mindful of Ms. DeGroat's attestation that she stopped resisting and tried to comply with the officers' orders after Officer Cordero threatened to tase her. (Doc. 60-1 at 3 ¶ 23.) However, the video footage from Officer Cordero's lapel camera directly contradicts her attestation on this point, showing that she continued to actively resist the officers after the threat was made. (*See* Section I., *supra*.) The Court must therefore disregard the attestation. *Thomas,* 607 F.3d at 659.

Moreover, even if the Court were to accept Ms. DeGroat's attestation on this point, she went on to attest that while trying to comply with the officers' orders, she engaged in conduct that any reasonable officer would have perceived as continued resistance. Specifically, she attested that as she was moving to exit her vehicle, she put her arm through her steering wheel, thereby jamming her shoulder in the steering wheel and anchoring herself to the vehicle. (Doc. 60-1 at 3-4 ¶¶ 24-25, 28.) No reasonable officer could have perceived this conduct as an attempt to exit the vehicle. Nor is there any evidence in the record that Ms. DeGroat tried to tell the officers that she was trying to get out of the car or that she was stuck. (*See* Section I., *supra*.)

The Court is also mindful of Ms. DeGroat's attestation that her age, size, and chronic health condition made her incapable of physically resisting the officers. (Doc. 60-1 at 2 ¶¶ 15-16; *id.* at 4 ¶¶ 26-27.) However, the video footage from Officer Cordero's lapel camera flatly contradicts this attestation, so that no reasonable jury could believe it. On the contrary, this footage shows that Ms. DeGroat was in fact able to resist the officers for over three minutes before they succeeded in subduing her. (*See* Section I., *supra*.)

Finally, in assessing the degree of force Officers Cordero, Newman, and Sanchez used, the Court is mindful of the two brief gaps in the video footage from Officer Cordero's lapel camera. (*See id.*) In light of these gaps, the Court has taken care not to reject any of Ms. DeGroat's evidence that could reasonably be construed to describe what happened during the gaps. (*Id.*) But even accepting such evidence as true, it does not create a genuine issue of material fact, because (a) Ms. DeGroat does not describe the use of any objectively unreasonable force that could have occurred during either of the gaps, and (b) the video footage unequivocally shows that she verbally and physically resisted the officers both before and after each gap. (*Id.*)

In sum, though the first *Graham* factor – the severity of the suspected crime at issue – initially justified only minimal force, it is undisputed that for the first several minutes of the incident, Officer Cordero used no force at all. Then, the undisputed material facts show that Ms. DeGroat responded to his and his fellow officers' initial use of minimal force with active physical resistance, which justified a more forceful response. And as a matter of law, the greater force the officers then used never exceeded the degree of force reasonably necessary to overcome Ms. DeGroat's resistance and arrest her.

The second and third *Graham* factors – whether the suspect's conduct raises immediate safety concerns and whether she actively resists arrest or tries to flee – further confirm that Officer Cordero's use of force was objectively reasonable as a matter of law. *Graham*, 490 U.S. at 396. Regarding the second factor, even viewed in her favor, the cognizable record evidence shows that a reasonable officer would have believed that Ms. DeGroat posed an immediate risk to herself, the officers on scene, and other motorists. Initially, the Tenth Circuit has aptly acknowledged that intoxicated individuals "are often unpredictable." *Novitsky v. City of Aurora*, 491 F.3d 1244, 1255 (10th Cir. 2007). And here, Ms. DeGroat concedes that Officers Cordero, Newman, and Sanchez

had reasonable suspicion and probable cause to believe that she was intoxicated. (Doc. 1 at 2-3 ¶¶ 6, 9; Doc. 30 at 1 ¶¶ 1-3; Doc. 34 at 3, 7; Doc. 60-1 at 2 ¶ 14.) Thus, the officers had reason to expect that Ms. DeGroat would act "unstably" and with "impaired judgment." *Helvie*, 66 F.4th at 1241; *Novitsky*, 491 F.3d at 1255.

In addition, based on the cognizable record evidence, the following facts are undisputed. Ms. DeGroat had just had a single-vehicle accident. (*See* Section I., *supra*.) Her car had come to rest on the snow-covered shoulder of a state highway. (*Id.*) It was early morning, dark, and very cold. (*Id.*) Ms. DeGroat was alone in her vehicle and had lost her cell phone after calling 911. (*Id.*) Her conversation was tangential and her mood labile. (*Id.*) She refused to obey officers' instructions, ignored their warnings, and responded to minimal force with active physical resistance. (*Id.*) She made profane and belligerent statements to the officers. (*Id.*) As a matter of law, a reasonable officer presented with the totality of these circumstances would have justifiably believed that Ms. DeGroat was likely to engage in erratic behavior dangerous to herself, the officers, and other motorists.[13] (*Id.*)

Finally, the third *Graham* factor – whether the suspect "is actively resisting arrest or attempting to evade arrest by flight" – heavily favors the degree of force Officers Cordero, Newman, and Sanchez used to remove Ms. DeGroat from her vehicle and arrest her. *Graham*, 490 U.S. at 396. When, during a traffic stop, a suspect persistently refuses to obey an officer's lawful

[13] A suspect's control over a motor vehicle may also pose an immediate safety risk, particularly in cases involving intoxication or proximity to a roadway. *Helvie*, 66 F.4th at 1241; *Mecham*, 500 F.3d at 1205. And here, it is undisputed that: Ms. DeGroat retained control over her car for much of the encounter; the officers had reason to believe she was intoxicated; and, her car was on the snowy shoulder of a state highway. (*See* Section I., *supra*.) Further, Mr. Beaver had told Officers Cordero and Newman that Ms. DeGroat had tried to drive away, and Ms. DeGroat told the officers that her car was working. (*Id.*) In this tense, rapidly evolving situation, Ms. DeGroat's continued control over her vehicle may well have caused the officers some concern even though, viewing the factual record in her favor, she could not have driven anywhere after her front-wheel-drive car lost a front wheel in the accident. (*Id.*) But even assuming Ms. DeGroat's continued control over her vehicle did not pose an immediate safety risk from the perspective of a reasonable officer at the scene, the undisputed material facts show that such an officer would have perceived her to pose a safety risk for the other reasons just discussed.

instructions to exit the vehicle or physically resists the officer's attempts to extract him or her, the Tenth Circuit has consistently found that the officer is entitled to use that degree of force reasonably necessary to overcome the resistance and remove the suspect from the vehicle. *Helvie*, 66 F.4th at 1233, 1240-41 (suspect refused multiple instructions to exit vehicle, yanked his arm away from officer, and leaned further into his truck); *Mecham*, 500 F.3d at 1204-05 (suspect ignored multiple instructions to exit vehicle and warnings that she would be arrested if she did not exit voluntarily); *Valencia v. De Luca*, 612 F. App'x 512, 515, 518-19 (10th Cir. 2015) (suspect refused multiple instructions to exit vehicle and resisted removal by bracing his legs against floorboard and grabbing steering wheel); *Simpson v. Kansas,* 593 F. App'x 790, 792-93, 797 (10th Cir. 2014) (suspect refused multiple instructions to exit vehicle).

Here, as already discussed, the undisputed material facts show that, for several minutes, Ms. DeGroat persistently refused Officers Cordero's instructions to exit her vehicle and ignored his warnings that he would use force to remove her if she did not. (*See* Section I., *supra*.) Only after Ms. DeGroat rejected all of his and Officer Newman's verbal efforts did the officers use minimal force to try to extract her. (*Id.*) And when they did, Ms. DeGroat responded with belligerence and active physical resistance. (*Id.*)

Then, as also discussed above, the undisputed material facts show that the force the officers used in response to Ms. DeGroat's resistance was objectively reasonable. Specifically, they: used a push-and-pull technique to dislodge Ms. DeGroat from the vehicle; offered to stop using force if Ms. DeGroat stopped resisting; moved her to the ground and held her there for only as long as it took to handcuff her; helped her up once she was handcuffed; and, moved the handcuffs to the front of her body in response to her complaints of pain. (*Id.*) In short, the undisputed facts show

that Officers Cordero, Newman, and Sanchez used only the amount of force reasonably necessary to overcome Ms. DeGroat's resistance, dislodge her from her vehicle, and arrest her.

The Court is cognizant of the record evidence that Ms. DeGroat suffered a painful, debilitating shoulder injury during her encounter with the officers. (*Id.*) But even viewing the record evidence in Ms. DeGroat's favor, this injury was plainly the unfortunate but natural consequence of her active physical resistance. In particular, both the video footage from Officer Cordero's lapel camera and Ms. DeGroat's own affidavit show that she first experienced shoulder pain only after she had disregarded the officers' instructions and warnings, physically resisted their initial minimal efforts to remove her from her car, and responded to their use of additional force by putting her arm through the steering wheel and anchoring her body to the car. (*Id.*) Further, the undisputed evidence shows that her shoulder injury was not exacerbated until she continued to resist the officers while they handcuffed her. (*Id.*)

In light of all of the foregoing, no reasonable juror could find sufficient facts to support a verdict in Ms. DeGroat's favor on her claim that Officer Cordero used excessive force against her. Rather, the undisputed facts show that the force he and his fellow officers used to push and pull Ms. DeGroat from her car, move her to the ground, and handcuff her was objectively reasonable and calibrated to the offense they suspected Ms. DeGroat of having committed, the immediate safety risks a reasonable officer would have perceived her to pose, and her erratic, resistant, and belligerent behavior. Officer Cordero is therefore entitled to summary judgment under the first prong of the qualified immunity analysis.[14] *Wilkins*, 33 F.4th at 1272; *Ibarra*, 2023 WL 6939236, at *8.

[14] In her affidavit, Ms. DeGroat attested to various facts related to Officer Cordero's alleged failure to obtain medical treatment for her shoulder injury. (Doc. 60-1 at 5 ¶¶ 33-35.) But, as previously noted, she has not raised any claims related to this alleged failure in her complaint, and indeed specifically admitted that Officer Cordero summoned an ambulance to the scene. (*See generally* Doc. 1; *see also id.* at 4 ¶ 16.) In addition, Ms. DeGroat makes no argument

**B. Ms. DeGroat has failed to show that she had a clearly established Fourth Amendment right to be free from the force Officer Cordero used against her.**

Under the second prong of the qualified-immunity analysis, Ms. DeGroat must show that the constitutional right she claims Officer Cordero violated was clearly established at the time of the incident. *Cummings v. Dean*, 913 F.3d 1227, 1239 (10th Cir. 2019).

> Ordinarily, a plaintiff may satisfy this clearly-established-law standard by identifying an on-point Supreme Court or published Tenth Circuit decision that establishes the unlawfulness of the defendant's conduct; alternatively, the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.

*Id.* (quotation marks and brackets omitted).

However, in her response to Officer Cordero's Motion, Ms. DeGroat cites no caselaw and makes no legal argument. (Doc. 60.) In other words, she does not even try to address whether the state of the law at the time of her encounter with Officer Cordero provided him with "fair warning" that his conduct was unconstitutional. *Sanchez*, 105 F.4th at 1293. As such, Ms. DeGroat has failed to meet her burden to show that the right she claims Officer Cordero violated was clearly established in the specific context of this case. *Wilkins*, 33 F.4th at 1272.

As noted in Section II., above, "[t]he specificity of clearly established law is especially important in the Fourth Amendment context, where … it is sometimes difficult for an officer to determine how the relevant legal doctrine … will apply to the factual situation the officer confronts." *Sanchez*, 105 F.4th at 1293 (quotation marks and brackets omitted). Thus, in the context of her Fourth Amendment excessive force claim against Officer Cordero, Ms. DeGroat's

---

and cites no caselaw to show that an officer's alleged failure to procure medical treatment for an arrestee who has previously rejected such treatment violates any constitutional right. (*See generally* Doc. 60.) And even if she had, the Tenth Circuit has held that "[t]here is no precedent supporting the notion that police officers have an affirmative duty to provide immediate medical care," even for injuries more serious than hers. *Crittenden v. City of Tahlequah*, 786 F. App'x 795, 802-03 (10th Cir. 2019) (finding officers were entitled to qualified immunity from constitutional claims based on failure to provide medical treatment or first aid to individual with gunshot wound to the head).

failure to identify specifically relevant clearly established law is particularly problematic. Nor is the Court required to manufacture legal arguments or sift through the record on Ms. DeGroat's behalf to find legal support for her claim. *Wells v. City & Cnty. of Denver*, 95 F. App'x 948, 949 (10th Cir. 2004) (affirming district court's grant of summary judgment on excessive force claim where plaintiff raised no legal argument). Officer Cordero is therefore entitled to qualified immunity under the second prong of the qualified-immunity analysis as well as the first.

## IV. CONCLUSION

Viewing the cognizable record evidence in the light most favorable to her, no reasonable jury could find sufficient facts to support a verdict in Ms. DeGroat's favor on her claim that Officer Cordero used excessive force against her on January 29, 2021. In addition, Ms. DeGroat has failed to identify any clearly established law that could have provided Officer Cordero with fair warning that his conduct was unconstitutional. Officer Cordero is therefore entitled to qualified immunity from Ms. DeGroat's Fourth Amendment excessive force claim against him, and his Motion for Summary Judgment (Doc. 58) is GRANTED.

IT IS SO ORDERED.

Kirtan Khalsa

KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent